UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

JOHN HANCOCK LIFE INSURANCE
COMPANY, U.S.A.,

Plaintiff,

– against –

RACHEL EISDORFER, BERNADETTE
PANZELLA, as Trustee of the Gary P.
Escandon Irrevocable Insurance Trust,
MARIO GURRIERI, EDWARD MUTCH,
KIM BENNETT, JONNELL
BRUNDAGE, and BRIGETTE LUTZ,

Interpleader Defendants.

_____

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

24-CV-2974 (ERK) (CHK)

KORMAN, *J.*:

## I.      Procedural Background

John Hancock Life Insurance Company ("John Hancock") brought this interpleader action to resolve competing claims to the $2,250,000 death benefit of a life insurance policy it issued.  ECF No. 1 ¶¶ 12, 31, 32.  John Hancock's interpleader action named seven defendants: Rachel Eisdorfer; Bernadette Panzella, as Trustee of the Gary P. Escandon Irrevocable Insurance Trust; Mario Gurrieri; Edward Mutch; Kim Bennett; Jonnell Brundage; and Brigette Lutz (collectively, the

1

"Interpleader Defendants").  On May 19, 2026, I granted John Hancock's Motion to Deposit Funds and for Interpleader Relief, dismissing John Hancock from the case once it deposited the Death Benefit with the Court registry.  *See* ECF No. 76.  All Defendants except Brigette Lutz—who was married to the Decedent at one point in time—have filed answers to John Hancock's Interpleader Complaint as well as cross-claims asserting their right to the payout (the "Death Benefit").[1]  *See* ECF Nos. 25, 26, 28.  Lutz has not appeared or made any filings in this action.

Interpleader actions proceed in two stages.  First a court "determines whether an interpleader action is appropriate and whether the stakeholder is entitled to bring the action." *JPMorgan Chase Bank, N.A. v. 29-33 Ninth Ave., LLC*, 710 F. Supp. 3d 259, 268–69 (S.D.N.Y. 2024).  Second, a court determines the rights of competing claimants to the property at issue. *Id.* at 269.  My order granting John Hancock's Motion to Deposit Funds and for Interpleader Relief represented the first stage of this interpleader action. *See* ECF No. 76.  This order addresses the second stage,

---

[1]   Bernadette Panzella styles her claim as a "Claim to the *Res*."  Both an affirmative claim to the *res* and a cross-claim against another claimant are cognizable forms of relief in an interpleader action. *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-cv-2843 (JG) (ARL), 2010 WL 4038826, at *3 (E.D.N.Y. Oct. 14, 2010) (considering a motion to dismiss an interpleader defendant's cross-claims against another claimant); *Reliance Standard Life Ins. Co. v. Luna*, No. 21-cv-0189 (GRB) (SIL), 2023 WL 9232955, at *6 (E.D.N.Y. Dec. 8, 2023) (*R. & R. adopted*) (an interpleader defendant must assert a claim, which can take the form of a claim to the *res*, in order to prevail in an interpleader action).  For conciseness, the claims filed by Panzella, Gurrieri, and the *Pro Se* Defendants are all referred to as "cross-claims" in this opinion.

limiting itself to ruling on Eisdorfer's motions to dismiss the cross-claims brought by Gurrieri, Panzella, Mutch, Bennett, and Brundage (collectively the "Trust Claimants").[2] *See* ECF Nos. 42–44, 62–64.

Gurrieri and Panzella each filed separate cross-claims, while Mutch, Bennett, and Brundage (together, the "*Pro Se* Defendants") filed a joint cross-claim. *See* ECF Nos. 25, 27, 28-1. Eisdorfer's three motions to dismiss these claims were filed once on September 26, 2024, *see* ECF Nos. 42–44, and again on January 24, 2025, *see* ECF Nos. 62–64. The memoranda accompanying her September 2024 motions are identical to those filed in January 2025 save for the addition of language reflecting that this is an interpleader action. Eisdorfer's motions to dismiss filed against the different Trust Claimants share substantial overlap and are therefore considered together in this opinion. *See e.g., Torres v. Cuomo*, No. 92 Civ. 5811 (JSM), 1993 WL 33639, at *1 (S.D.N.Y. Feb. 3, 1993).

## II.    Pleading Standard

Eisdorfer does not invoke a specific federal rule under which she seeks to dismiss the Trust Claimants' cross-claims. Nevertheless, because she has labeled her ECF filings as motions to "Dismiss for Failure to State a Claim," the Court interprets them to be motions to dismiss under Federal Rule of Civil Procedure

---

[2]  Gurrieri's Motion for Judgement on the Pleadings will be considered in a separate order.

12(b)(6).  *See e.g.*, *Whittle v. Westchester Cnty. Police Dep't*, No. 06 Civ. 3665 (LAP), 2008 WL 919348, at *1 n.1 (S.D.N.Y. Mar. 28, 2008).

To prevail on her motions to dismiss, Eisdorfer must demonstrate that the facts alleged in the cross-claims or in the attached documents do not support the Trust Claimants' claims to the Death Benefit.  "Rule 12(b) applies equally to claims, counterclaims, cross-claims and third-party claims . . . ."  *Wine Enthusiast, Inc. v. Vinotemp Int'l Corp.*, 317 F. Supp. 3d 795, 800 (S.D.N.Y. 2018).  To survive a Rule 12(b)(6) motion to dismiss, a cross-claim must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In considering a motion to dismiss under Rule 12(b)(6), courts must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)).

In ruling on these motions to dismiss, consideration may be given only to facts asserted within the four corners of the cross-claims, documents attached to the cross-claims, and any documents incorporated into the cross-claims by reference.  *See*

4

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  For a document to be incorporated by reference, a cross-claim must make "a clear, definite and substantial reference to [it]."  *BankUnited, N.A. v. Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).

### III.   Factual Allegations

The following facts are drawn from Trust Claimants' cross-claims—as well as documents they incorporate by reference—and are accepted as true for purposes of deciding Eisdorfer's motions to dismiss.  *See Picture Pats., LLC v. Aeropostale, Inc.*, No. 07 Civ. 5567 (JGK), 2009 WL 2569121, at *1 (S.D.N.Y. Aug. 19, 2009). As detailed below, Bernadette Panzella and the *Pro Se* Defendants make certain factual allegations not made by Gurrieri.  These allegations are not considered for purposes of assessing Eisdorfer's motion to dismiss Gurrieri's cross-claim.

On September 20, 2007, Gary Escandon took out a life insurance policy issued by John Hancock (the "Policy") which would pay out $2,250,000 upon his death. ECF No. 25 ¶ 42; ECF No. 27 ¶ 9[3]; ECF No. 28-1 ¶ 43.  On October 21, 2008, Escandon designated his then-fiancée Brigette Lutz as the sole beneficiary under the Policy.  *See* ECF No. 1-10.  On December 10, 2009, Escandon created the "Gary P. Escandon Irrevocable Insurance Trust" (the "Trust") via an "Irrevocable Insurance

---

[3]  Citations to ECF No. 27 are to paragraphs in Panzella's Claim to the *Res* rather than her Answer, both being contained in ECF No. 27.

Trust Agreement" (the "Trust Agreement") which identified Escandon as the Settlor and Gurrieri as a Trustee.  ECF No. 25 ¶ 43; ECF No. 27 ¶¶ 10–11.  On the same day, Escandon executed an assignment of the Life Insurance Policy to Gurrieri in his capacity as Trustee of the Trust and designated Gurrieri as the Policy's sole beneficiary. ECF No. 1-11, at 2; ECF No. 25 ¶ 44; ECF No. 27 ¶ 11.  On January 4, 2010, John Hancock acknowledged receipt of this assignment and change in beneficiary.  ECF No. 1-12; ECF No. 25 ¶ 45; ECF No. 27 ¶ 13.

Four years later, on January 9, 2014, Gurrieri and Eisdorfer executed an "Assignment of Life Insurance Policy as Collateral" form (the "Collateral Assignment") which assigned the Policy to "Rachel Eisdorfer as Nominee."  ECF No. 1-13, at 1; ECF No. 25 ¶ 63; ECF No. 27 ¶ 21.  This form stated that Gurrieri, as the assignor, warranted the validity of the assignment.  ECF No. 1-13, at 1.  The Collateral Assignment form also provided that the assignment would be "immediately revoked and deemed null and void upon Gary Escandon's satisfaction of the promissory note referenced in a document dated January 9, 2014."  *Id.*  This appears to be a reference to a separate promissory note, notarized on January 7, 2014, in which Escandon promised to repay Eisdorfer $2,650,000.  *See* ECF No. 42-4.  In essence, Escandon's Life Insurance Policy—which at this point was property of the Irrevocable Trust controlled by Gurrieri as Trustee—was to serve as the security for a loan from Eisdorfer to Escandon.

6

Four days later, on January 13, 2014, Gurrieri wrote to John Hancock that the assignment to Eisdorfer "should be considered null and void" because, previously unknown to Gurrieri, "the only individual able to assign the benefit of the policy [under the terms of the Trust Agreement] is Mr. Escandon's wife, Bri[]gette." ECF No. 1-14; ECF No. 25 ¶ 59; *see also* ECF No. 27 ¶¶ 20–22. Eisdorfer's attorney at the time was copied on these communications. ECF No. 1-14. On January 27, 2014, John Hancock responded that it required Eisdorfer's written confirmation "that she has no interest in this policy" in order to void the Collateral Assignment. ECF No. 1-15; ECF No. 25 ¶ 60.

Nothing in the record suggests that Gurrieri ever provided John Hancock with Eisdorfer's written confirmation that she had no interest in the Policy.[4] On June 23, 2014, John Hancock informed Gurrieri and Eisdorfer that the Collateral Assignment had been processed. ECF No. 1-19, at 1; ECF No. 25 ¶ 62.

---

[4] The rest of the correspondence between Gurrieri and John Hancock, which John Hancock attached to its Interpleader Complaint, is not incorporated by reference in the cross-claims but is as follows: On February 19, 2014, John Hancock sent a letter to Gurrieri reminding him that it had not received a response to its January 27 letter. ECF No. 1-16. On February 26, 2014, Gurrieri responded to John Hancock that he was "in the process of obtaining a [r]ecission of the Collateral Assignment from Rachel Eisdorfer." ECF No. 1-17, at 1. On May 22, 2014, Brigette Lutz wrote to John Hancock objecting to "John Hancock taking any action to deprive [her] of [her] entitlement to the [Life Insurance Policy]." ECF No. 1-18.

Escandon died on August 14, 2023.  ECF No. 25 ¶ 27; ECF No. 1 ¶ 27.  As a result, the Policy's Death Benefit totaling $2,250,000 became due.  ECF No. 1-9 at 28.

### a.  The Trust Agreement

Under Article EIGHTH (B) of the Trust Agreement, Lutz and her issue are to be considered deceased for purposes of determining their entitlement to Trust property if she is no longer in a committed relationship with, or married to, Escandon "during his life."  ECF No. 25 ¶ 47; ECF No. 27-1, at 18.  Under Article FIFTH (F)(2), if neither Lutz nor her issue are alive at the time of Escandon's death, any property held by the Trust is to be distributed as follows: 29% to Mario C. Gurrieri; 25% to Edward J. Mutch, III; 25% to Kim E. Bennett; and 21% to Jonnell Nora Brundage or her issue.  ECF No. 27-1, at 9–10, 2; ECF No. 27 ¶ 15; ECF No. 25 ¶ 46.

The Trust Agreement provides in Article FIFTH (B) that Independent Trustees "shall have all the rights of an absolute owner" with respect to the Life Insurance Policy held by the Trust. ECF No. 27-1, at 5–6.  Independent Trustees are empowered to apply the net income and principal of the Trust "for the benefit of any one or more of the Permitted Beneficiaries" during Escandon's lifetime.  *Id.* at 8.  Article SECOND (G) defines Independent Trustees as "Trustees then serving other than any individual who is then a Permitted Beneficiary."  ECF No. 27-1, at 2; ECF No. 25 ¶ 55; ECF No. 27 ¶ 18.  Article SECOND (F) lists Lutz, Gurrieri, Mutch,

Bennett, and Brundage as "Permitted Beneficiaries."  ECF No. 27-1, at 2.  Gurrieri therefore was not an Independent Trustee at the time he assigned the Life Insurance Policy to Eisdorfer.  ECF No. 25 ¶ 56; ECF No. 27 ¶ 19.

### b.  Competing Claims to the Benefit

On or about September 27, 2023, John Hancock received a letter from Gurrieri stating that Eisdorfer "will soon be seeking to make a claim" but that "payment to [] Eisdorfer would be deemed improper and incorrect."  ECF No. 1-20, at 1–2; ECF No. 25 ¶ 28.

Subsequently, on or about October 23, 2023, John Hancock received a claim to the Death Benefit from Bernadette Panzella, in her capacity as the successor Trustee of the Trust, along with a notice that Gurrieri had resigned as Trustee.  ECF No. 1-21, at 45, 47; ECF No. 25 ¶ 29; *see also* ECF No. 27 ¶¶ 33–35.

On or about October 26, 2023, John Hancock received a letter from Eisdorfer's attorney explaining that Eisdorfer intended to submit a claim to the Death Benefit and requesting that John Hancock not release the Death Benefit to anyone other than Eisdorfer.  ECF No. 1-22; ECF No. 25 ¶ 30.

### c.  Allegations Made Only by Panzella and the *Pro Se* Defendants

In addition to making substantively the same allegations as Gurrieri's cross-claim, Panzella and the *Pro Se* Defendants additionally allege that "any debt owed by Escandon to Eisdorfer was paid in full on or around February 13, 2015."  ECF No. 27 ¶ 29; ECF No. 28-1 ¶ 42.  To support this assertion, they attach two

documents.  First, they point to a $424,000 check written by Eisdorfer's current attorney on behalf of "Chana Daskal" which is labelled as being for "[f]ull repayment of Eisdorfer loan."  ECF No. 27-2; ECF No. 28-1, Ex. 1.  This check identifies an IOLA (meaning an "Interest on Lawyer Account" typically used to hold funds belonging to legal clients) as the recipient, which the allegations do not connect to Eisdorfer.  Second, Panzella and the *Pro Se* Defendants attach a transcript from a New York state proceeding in which—they claim—Eisdorfer represented that the "payment of $424,000 from Chana Daskal's Trust fund was in exchange for the transfer [of] Eisdorfer's house to an entity known as 148 South Eighth Street LLC."  ECF No. 27 ¶ 31; ECF No. 27-3; ECF No. 28-1, Ex. 2.  None of the allegations or exhibits presently in the record shed light on the identity of "Chana Daskal" or how these two documents are relevant to the repayment of a loan between Eisdorfer and Escandon.  In any case, neither Gurrieri, Panzella, nor the *Pro Se* Defendants allege that there is an outstanding loan between Eisdorfer and Escandon.

## IV.    Eisdorfer's Arguments in Favor of Dismissal

Eisdorfer makes four arguments in support of her motions to dismiss.[5]  First, Eisdorfer contends that the Trust Claimants' reading of the Trust Agreement—as prohibiting Gurrieri from making the assignment—is implausible.  ECF No. 62-6, at

---

[5]  Two of these arguments were made for the first time in Eisdorfer's reply brief.  Though I am not required to entertain these arguments, I do so here to explain why they are unconvincing.  *See In re Pugh*, No. 18-cv-06508 (JMA), 2020 WL 2836823, at *7 (E.D.N.Y. May 31, 2020).

4–6; ECF No. 63-6, at 4–6; ECF No. 64-5, at 4–6.  Second, Eisdorfer argues that even if the Trust Agreement prohibited Gurrieri from assigning the Policy to her, its terms were modified by Gurrieri's "conduct in executing it and submitting the Collateral Assignment to John Hancock, and John Hancock's acceptance of it."  ECF No. 62-1, at 4; ECF No. 63-1, at 3–4; ECF No. 64-1, at 4–5.  Third, Eisdorfer asserts that even if the Policy was improperly assigned to her, her reliance on the assignment prevents the Trust Claimants from now seeking an interest in the Policy.  ECF No. 62-1, at 5–7; ECF No. 63-1, at 4–7; ECF No. 64-1, at 5–7.  Fourth, Eisdorfer seeks to refute allegations that there was no loan between Escandon and Eisdorfer or that any such loan was repaid.  ECF No. 62-6, at 6–9; ECF No. 63-6, at 6–9; ECF No. 64-5, at 6–9.

## V.   Discussion

### a.  Applicable State Law

The parties' claims to the Death Benefit turn on the interpretation of the Trust Agreement and Collateral Assignment.  The Trust Agreement contains a choice of law clause designating New Jersey Law as the law governing its "interpretation, validity and administration."  ECF No. 27-1, at 29.  The Collateral Assignment designates the laws of Massachusetts as governing "any dispute regarding this collateral assignment."  ECF No. 1-13, at 1.  Because this action was brought under 28 U.S.C. §1335, New York's choice of law rules apply.  *See Klaxon Co. v. Stentor Electronic Mfg. Co.*, 313 U.S. 487, 496 (1941) (choice of law rules of the state where

11

a district court sitting in diversity is located apply); *Am. Fid. Fire Ins. Co. v. Paste-Ups Unlimited, Inc.*, 368 F. Supp. 219, 223 (S.D.N.Y. 1973).  In New York, courts should enforce choice of law clauses which bear "a reasonable relationship to the parties or the transaction." *Burns v. Del. Charter Guarantee & Tr. Co.*, 805 F. Supp. 2d 12, 22 (S.D.N.Y. 2011) (citing *Lupien v. Lupien*, 891 N.Y.S.2d 785, 785–86 (4th Dept. 2009)) (internal quotation marks omitted).  The Trust Agreement was executed in New Jersey by a Settlor and Trustee who were both New Jersey residents at the time, and it mostly involves parties who are citizens of New Jersey.  *See* ECF No. 26-1, at 39; ECF No. 27-1, at 1; ECF No. 25 ¶¶ 39, 41; ECF No. 27 ¶¶ 1–8.  The Collateral Assignment seeks to assign a benefit managed and disbursed by John Hancock, which has its principal place of business in Massachusetts.  ECF No. 1 ¶ 1; ECF No. 25 ¶ 40.  Consequently, New Jersey law applies in interpreting the terms of the Trust Agreement and Massachusetts law applies when doing the same for the Collateral Assignment.

### b. The Terms of the Trust Agreement Prohibited Gurrieri's Assignment of the Policy to Eisdorfer.

Trust Claimants seek a declaratory judgement that the Collateral Assignment of the Death Benefit to Eisdorfer was void *ab initio*.  Trust Claimants support this assertion by pointing to the SECOND and FIFTH articles of the Trust Agreement, which they contend prevented Gurrieri from making the assignment to Eisdorfer because only "Independent Trustees" could do so.  ECF No. 25 ¶¶ 54–58; ECF No.

12

27 ¶¶ 17–23; ECF No. 28-1 ¶¶ 40–41.  Conversely, in Eisdorfer's view, Article FOURTEENTH of the Trust Agreement permits all Trustees to execute an assignment, and Articles SIXTEENTH and NINTEENTH "protect innocent third parties . . . involved in transactions with the Trustee[] from having to inquire into the scope of a Trustee's authority."  ECF No. 62-6, at 4–6; ECF No. 63-6, at 4–6; ECF No. 64-5, at 4–6.  Therefore, Eisdorfer contends, the Trust Claimants' cross-claims should be dismissed because the Collateral Assignment validly assigned the Death Benefit to her when Gurrieri executed it.  ECF No. 62-6, at 6; ECF No. 63-6, at 6; ECF No. 64-5, at 6.

### i.  The Trust Agreement Did Not Permit Gurrieri to Assign the Death Benefit to Eisdorfer.

Under New Jersey law, a court interpreting a trust agreement should apply the "probable intent" doctrine.  *See In re Tr. of Nelson*, 184 A.3d 526, 530 (N.J. Super. Ct. App. Div. 2018).  This doctrine holds that a trust agreement's "language and statutory rules of construction control 'unless the probable intent of such settlor or of such individual, as indicated by the trust or by such governing instrument and relevant circumstances, is contrary.'"  *Id.* at 530–31 (quoting N.J. STAT. ANN. § 3B:3–33.1(b) (West 2025)).  In performing this analysis, courts should "consider [the parties'] relations, the attendant circumstances and the objectives [the parties] were trying to obtain."  *Tr. of Nelson*, 184 A.3d at 532 (internal quotation marks omitted) (quoting *Fid. Union Tr. Co. v. Robert*, 178 A. 2d 185, 188 (N.J. 1962)).

13

The Trust Claimants have adequately pled that the Trust Agreement reserves the right to assign the Policy to Independent Trustees—which Gurrieri was not at the time of the assignment.  The Trust Agreement defines Independent Trustees as "Trustees then serving other than any individual who is then a Permitted Beneficiary."  ECF No. 27-1, at 2; ECF No. 25 ¶ 55; ECF No. 27 ¶ 18.  By contrast, Trustees are defined as "the original Trustee and . . . each additional or successor Trustee."  ECF No. 27-1, at 1.  Gurrieri—who is listed as both a Permitted Beneficiary of the Trust and as the original Trustee—is thus not an Independent Trustee under the plain language of the Trust Agreement.  *See* ECF No. 27-1, at 1–2.

Trustees are permitted to "use as a security any property[] to satisfy . . . [a] security interest."  ECF No. 27-1, at 31.  However, this only applies to "property held under [the] Trust Agreement" already subject to a security interest.  *Id.*  Eisdorfer's reply briefs claim, without citing to a specific provision, that "Article FOURTEENTH . . . expressly allows the Trustee to execute an [a]ssignment."  ECF No. 62-6, at 5–6; ECF No. 63-6, at 5–6; ECF No. 64-5, at 5–6.  It would be more accurate to say that this article *implicitly* allows Trustees to "execute and deliver [] assignments . . . necessary or appropriate for the administration of the . . . trust" via its reference to a New Jersey statute outlining the general rights and responsibilities of fiduciaries.  N.J. REV. STAT. § 3B:14-23 (West 2024); *see also* ECF No. 27-1, at 29.  By contrast, the Trust Agreement explicitly grants Independent Trustees the

power "to sell or assign the policy . . . solely for the purposes set forth in [the] Trust Agreement."  ECF No. 27-1, at 5–6.  Furthermore, only Independent Trustees are explicitly granted the "rights of an absolute owner" with respect to the Life Insurance Policy.  *Id.* at 5.  The Trust Agreement makes clear that Escandon's intent was for these rights to be exercised only "for the benefit of any one or more of the Permitted Beneficiaries."  *Id.* at 5, 8.

The Agreement also specifies that the Trust is irrevocable and that Escandon "shall have no right or power . . . to alter, amend, revoke or terminate the trusts created hereby, or any of the terms of this Trust Agreement."  *Id.* at 5.  Finally, the Trust Agreement specifies that Escandon did "not intend to reserve any right to control or direct the Trustees," *id.* at 11–12, and Escandon is not listed as a Permitted Beneficiary of the Trust, *id.* at 2.

While Eisdorfer may consider it a "brazen, almost delusional, reading," *see* ECF No. 62-6, at 2, the most logical reading of the Trust Agreement is that only Independent Trustees are empowered to assign the Policy.  The best evidence of this is that the Trust Agreement explicitly grants the power of assignment to Independent Trustees while omitting that power from the powers granted to Trustees such as Gurrieri.  *See* ECF No. 27-1, at 5–6.  Applying New Jersey's "probable intent" doctrine, the Trust Claimants have therefore sufficiently pled that the Trust Agreement did not permit Gurrieri to assign the Policy to Eisdorfer.  There may be

15

further extrinsic evidence bearing upon Escandon's intent, but that evidence is not part of the record on Eisdorfer's motions to dismiss.

Additionally, though no party raises this point, it is not clear that *any* Trustee, independent or otherwise, could have validly assigned the Policy as collateral for a loan from Eisdorfer to Escandon. The Trust Agreement created an irrevocable trust of which Escandon was not a beneficiary and over which he had no control. The language of the Trust Agreement is explicit that Independent Trustees can exercise the rights of absolute owners with regard to the Policy "solely for the purposes set forth in [the] Trust Agreement." ECF No. 27-1, at 6; *see also* Restatement (Third) of Trusts § 86 (2007). Thus, Gurrieri's assignment to Eisdorfer "at the request of Gary Escandon" and for his sole benefit seemingly would have violated Trust Agreement even if Gurrieri were vested with the authority of an Independent Trustee. *See* ECF No. 25 ¶ 57; *see also* ECF No. 27 ¶ 24.

> **ii. Because the Assignment Was Not Permitted by the Trust Agreement, the Trust Retained Its Interest in the Life Insurance Policy.**

Because Trust Claimants plausibly allege that Gurrieri lacked authority to execute the Collateral Assignment, the remaining question is whether those facts would legally entitle the Trust Claimants to the Death Benefit. Distinct from the issue of whether the Trust Agreement barred Gurrieri from making the Assignment, whether the Collateral Assignment was void because of the Trust Agreement's language is a question of Massachusetts law. *See Wells Fargo Bank, N.A. v. Est. of*

16

*Gold*, No. 22-cv-6114 (BMC), 2025 WL 1808671, at *8 (E.D.N.Y. July 1, 2025) (applying state substantive law to the issue of whether a life insurance policy was validly assigned). Under Massachusetts law, when trust property is conveyed in breach of trust, only a purchaser for value without notice of the wrong takes the property free of the interest of the trust beneficiaries. *See In re Mill Concepts Corp.*, 123 B.R. 938, 944 (Bankr. D. Mass. 1991) (citing Restatement (Second) of Trusts § 284 (1959)); *Jackson v. Truck Drivers' Union Loc. 42 Health and Welfare Fund*, 933 F. Supp. 1124, 1137–38 (D. Mass. 1996). The parties' briefs assume New York law applies to this issue; its application would not change the outcome here. *See William Penn Life Ins. Co. of New York v. Viscuso*, 569 F. Supp. 2d 355, 364 (S.D.N.Y. 2008) ("[W]here an attorney-in-fact seeks to enter into a transaction that the governing power of attorney prohibits, the transaction is invalid.").

The allegations in the cross-claims do not establish that Eisdorfer was a purchaser for value with regard to the Collateral Assignment. Though the Collateral Assignment was purportedly made "as [c]ollateral" for the loan made by Eisdorfer to Escandon, *see* ECF No. 1-13, at 1, there are insufficient allegations to establish that this represented value for the Trust or its Beneficiaries. For one, the cross-claims contest that there ever was an outstanding loan and assert that any such loan has been repaid—which would render the Collateral Assignment void. ECF No. 25 ¶¶ 69–70; ECF No. 27 ¶¶ 26–27, 29–32; ECF No. 28-1 ¶ 42. Second, the Collateral Assignment was not supported by consideration because it benefited Escandon,

17

rather than the trust Beneficiaries. *See Demoulas v. Demoulas Super Mkts., Inc.*, 677 N.E.2d 159, 190 (Mass. 1997). To be sure, a conveyance exchanged for the benefit of a party other than the conveyor can represent a purchase for value. *See Finegan v. Prudential Ins. Co. of Am.*, 14 N.E.2d 172, 176 (Mass. 1938) ("Consideration for an assignment need not move to the assignor—in the ordinary sense of those words—if furnished in accordance with a bargain made by such assignor."). Those conveyances, however, typically involve a benefit to a third party that the conveyor desired and bargained for. *See, e.g., Perry v. F.D.I.C.*, No. 08cv11054-NG, 2010 WL 5349883, at *7 (D. Mass. Dec. 21, 2010). On these facts, it does not appear that the loan secured by Escandon was something desired by the Trust or its Beneficiaries such that it can qualify as consideration. Because Eisdorfer has moved to dismiss competing claims to the Death Benefit under Rule 12(b)(6), Trust Claimants' factual allegations are to be credited, and all reasonable inferences should be drawn in their favor. *See Elias*, 872 F.3d at 104. At the motion to dismiss stage, Trust Claimants have alleged facts sufficient to support a claim to the Death Benefit based on the invalidity of Gurrieri's erroneous assignment.

Eisdorfer also argues that Articles SIXTEENTH and NINETEENTH protect innocent third parties such as herself from having to inquire into the scope of a Trustee's authority. ECF No. 62-6, at 6; ECF No. 63-6, at 6; ECF No. 64-5, at 6. Article SIXTEETH (C) states that "[n]o person dealing with the Trustees shall . . . be required to inquire into the authority for or propriety of any action by the

Trustees." ECF No. 26-1 at 35–36.[6]   Similarly, Article NINETEENTH states that "[a]nyone may rely upon any statement of fact relating to this Trust Agreement . . . which statement of fact is certified under oath by any one who appears from the original document . . . to be the Trustee hereunder." *Id.* at 37–38.   Under Massachusetts law, these conclusive evidence provisions relieved Eisdorfer of a duty to inquire into Gurrieri's authority only if she had no reason to believe Gurrieri did not have the authority to assign the Policy to her. *See, e.g.*, *Penta v. Concord Auto Auction, Inc.*, 511 N.E.2d 642, 646 (Mass. App. Ct. 1987); *Mello v. Mello*, No. 04-P-810, 2005 WL 1225957, at *4 (Mass. App. Ct. May 24, 2005).   Massachusetts caselaw further suggests it is unreasonable not to inquire into a conveying trustee's authority when the conveyance would divest a beneficiary of their interest without consideration. *See Mello*, 2005 WL 1225957, at *4.   This is true even if the trust agreement contains a conclusive evidence provision. *Id.*   Thus, because the alleged facts establish that the Collateral Assignment would have divested the Trust's Beneficiaries of the Death Benefit without consideration, the existence of conclusive evidence provisions in the Trust Agreement do not defeat the Trust Claimants' cross-claims.

---

[6] The version of the Trust Agreement attached to Panzella's complaint is incomplete.  I consider the full version, which is attached to Eisdorfer's answer and cross-claim, *see* ECF No. 26-1, to be incorporated by reference by all of the Trust Claimants' cross-claims since it is integral to their claims.

19

### c.  Modification by Conduct

Eisdorfer next argues that even if the Trust Agreement prohibited Gurrieri from assigning the Policy, the Agreement was modified by Gurrieri's conduct.  ECF No. 62-1, at 3–4; ECF No. 63-1, at 3–4; ECF No. 64-1, at 4–5.  In support of this argument, Eisdorfer claims—without citing to any allegations and without further explanation—that "[Gurrieri's] conduct in executing [the Collateral Assignment] and submitting [it] to John Hancock, and John Hancock's acceptance of it, modified the terms [of the Agreement] to allow the Policy's assignment."  ECF No. 62-1, at 4; ECF No. 63-1, at 4; ECF No. 64-1, at 4–5.  Eisdorfer's reply briefs add only that all parties to the Trust Agreement consented to the modification because they never challenged the Collateral Assignment until Escandon died.  ECF No. 62-6, at 10–11; ECF No. 63-6, at 10–11; ECF No. 64-5, at 10–11.

Courts may grant a motion to dismiss on the basis that an agreement was modified by conduct where the facts in the cross-claim and documents incorporated therein give rise to that affirmative defense.  *See Ide v. Brit. Airways PLC*, 529 F. Supp. 3d 73, 83 n. 5 (S.D.N.Y. 2021).  Under New Jersey law, modification by conduct may be shown by either an "explicit agreement to modify or by the actions and conduct of the parties as long as the intention to modify is mutual and clear."[7]

---

[7]  Eisdorfer briefed this issue assuming New York law would apply.  The standard for modification by conduct in New York is similar to that of New Jersey, requiring "proof of . . . mutual assent" to modification, which "may be prove[n] circumstantially by the conduct of the parties."  *Lawrence M. Kamhi, M.D., P.C. v.*

*DeAngelis v. Rose*, 727 A.2d 61, 70 (App. Div. 1999).  Mutual assent must be demonstrated by all parties to the contract, and "[u]nilateral statements or actions made after an agreement has been reached . . . do not serve to modify the original terms of a contract." *McGrath v. Poppleton*, 550 F. Supp. 2d 564, 571 (D.N.J. 2008) (quoting *Cnty. of Morris v. Fauver*, 707 A.2d 958, 967 (N.J. 1998)) (internal quotation marks omitted).

The allegations in the cross-claims and the documents they incorporate by reference do not evince a clear and mutual intent to modify the Trust Agreement. First, as the Trust Claimants point out, nothing suggests that any party to the Trust Agreement other than Gurrieri consented to a modification.  Under New Jersey law and the terms of the Trust Agreement, Gurrieri was not empowered to unilaterally modify the Trust Agreement.  *See Coffey v. Coffey*, 668 A.2d 76, 83 (N.J. App. Div. 1995) (trustee could not change the terms of the trust where he was not empowered to do so by the trust instrument).  There are no allegations in any of the cross-claims addressing whether Panzella, Mutch, Bennett, or Brundage consented to a modification.  Nor is it the case that the Beneficiaries' silence represented a clear intent to modify the terms of the Trust Agreement, as Eisdorfer urges me to hold. ECF No. 62-6, at 10–11; ECF No. 63-6, at 10–11; ECF No. 64-5, at 10–11.  In fact,

---

*E. Coast Pain Mgmt., P.C.*, 112 N.Y.S.3d 189, 191 (N.Y. App. Div. 2019) (internal quotation marks omitted).  The application of New York law to this issue would not change the outcome.

nothing in the allegations suggests that any of the Beneficiaries other than Gurrieri *were even aware* of the Collateral Assignment to Eisdorfer.

Second, even if only Gurrieri's consent were required to modify the Trust Agreement, none of the cross-claims or documents incorporated therein suggest this was Gurrieri's intent. Indeed, when Gurrieri learned the Collateral Assignment violated the terms of the Trust Agreement, he immediately sought to have John Hancock void the Collateral Assignment. ECF No. 1-14; ECF No. 25 ¶ 59. Put simply, the allegations do not contain "mutual and clear" actions supporting an implied modification of Trust Agreement via conduct. *DeAngelis*, 727 A.2d at 70; *see also Fauver*, 707 A.2d at 966 (quoting *Anstalt v. F.I.A. Ins. Co.*, 749 F.2d 175, 178 (3d Cir. 1984)) (internal quotation marks omitted). I therefore decline to dismiss the Trust Claimants' cross-claims on the basis that the Trust Agreement was modified.

### d. Equitable Estoppel

Eisdorfer next argues that under the doctrine of equitable estoppel, the Trust Claimants are estopped from arguing that the assignment of the policy to Eisdorfer was void. ECF No. 62-1, at 5–7; ECF No. 63-1, at 5–7; ECF No. 64-1, at 5–7. Under New Jersey law, the elements of equitable estoppel are: (1) a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance and (2) reliance by the party seeking estoppel to the detriment of that party. *D'Agostino v. Maldonado*,

22

78 A.3d 527, 546 (N.J. 2013).  The test for equitable estoppel is substantively the same under New York law.  *See Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 585 (E.D.N.Y. 1994).

Here again, Eisdorfer does not cite to allegations in the cross-claims to support her argument.  Instead, Eisdorfer contends it is "very clear that equitable estoppel must apply" because "Eisdorfer detrimentally relied on Escandon and Gurrieri's . . . promise to assign the Policy to her, in exchange for extending the Loan to Escandon." ECF No. 62-1, at 6; ECF No. 63-1, at 7, ECF No. 64-1, at 7.  I note that upon a motion to dismiss, it is not the Court's role to "scour the record . . . and serve generally as [the movant's] advocate."  *Celestin v. Martelly*, 698 F. Supp. 3d 443, 472 (E.D.N.Y. 2023) (citing *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999)) (internal quotation marks omitted).  In any case, the facts alleged by Gurrieri do not support Eisdorfer's argument that Gurrieri should be estopped.  On the contrary, Gurrieri makes no allegations suggesting any reliance by Eisdorfer or that there was an intentional misrepresentation.

In support of her estoppel argument, Eisdorfer attaches a promissory note signed by Escandon showing that Eisdorfer extended him a loan of $2,650,000. *See* ECF No. 62-4.  Though this document is arguably incorporated by reference into the cross-claims, *see* ECF No. 25 at ¶ 69, its contents are insufficient to warrant dismissal at this stage of the litigation.  First, the promissory note states that it is secured by mortgages on various Brooklyn properties, without any reference to the

Policy or Death Benefit. ECF No. 62-4, at 2. Second, even if the promissory note identified the Policy as collateral, it does not establish that Gurrieri knowingly made a misrepresentation. Gurrieri's Cross-Claim therefore survives Eisdorfer's theory of equitable estoppel.

### e. Existence and Repayment of a Loan

Both Eisdorfer and the Trust Claimants spill much ink about whether a loan between Escandon and Eisdorfer—secured by the Collateral Assignment—ever existed. The cross-claims assert that Eisdorfer has provided no evidence regarding such a loan. ECF No. 25 ¶ 69; ECF No. 27 ¶¶ 26–27; ECF No. 28-1 ¶ 42. Conversely, language in the Collateral Assignment suggests it was intended to secure a loan from Eisdorfer to Escandon. ECF No. 1-13, at 1.

Panzella and the *Pro Se* Defendants further allege, though Gurrieri does not, that if a loan did exist, it has been repaid in full. ECF No. 27 ¶¶ 26–32; ECF No. 28-1 ¶ 42. To the extent that the existence and repayment of a loan impacted the parties' rights to the Death Benefit, it is a disputed factual issue which cannot justify dismissal at the motion to dismiss stage. *See Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 245–46 (S.D.N.Y. 2014).

### f. Eisdorfer's Standing

Lastly, Eisdorfer's memorandum in support of her motion to dismiss argues that she has standing, presumably in response to allegations in Gurrieri's cross-claim that she is not a real party in interest. ECF No. 62-1, at 7–8; ECF No. 25 ¶¶ 63–68.

24

None of the other Trust Claimants challenge Eisdorfer's standing to seek dismissal of their cross-claims. Gurrieri's opposition brief spends almost three full pages arguing that Eisdorfer "[l]acks [s]tanding to [s]ue" because the Collateral Assignment assigned the policy to Eisdorfer "[a]s Nominee." ECF No. 62-5, at 15–18.

Parties against whom a claim is asserted are naturally entitled to seek dismissal of that claim—though Courts do not typically characterize this right as a party having "standing." *See Griffin v. City of New York*, No. 22-CV-8521 (AS), 2025 WL 2198715, at *5 (S.D.N.Y. Aug. 1, 2025); *Channer v. Loan Care Serv. Ctr., Inc.*, No. 3:11cv135 (SRU), 2011 WL 5238878, at *4 (D. Conn. Nov. 1, 2011) ("The issue of standing relates not to defendants, but to the plaintiff, and whether the plaintiff has the legal authority to sue. Therefore, the standing question does not affect the ability of the defendants to file motions to dismiss."). Courts generally only assess the standing of the movant in a motion to dismiss when that movant seeks to dismiss claims filed against parties other than itself. *See, e.g., Dover Ltd. v. A.B. Watley, Inc.*, No. 04 Civ. 7366 (FM), 2006 WL 2987054, at *8 (S.D.N.Y. Oct. 18, 2006) (holding that a party lacked standing to move for dismissal of a claim in which they were not named as a defendant); *Dist. Att'y of New York Cnty. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 194 (S.D.N.Y. 2018) (expressing unease with class plaintiffs' assertion, in an interpleader action, that they had standing to move to dismiss cross-claims not made against them).

25

Gurrieri's brief does not identify any controlling law suggesting that Eisdorfer lacks standing to seek dismissal of his cross-claim against her.  Instead, Gurrieri affirmatively argues that Eisdorfer has no standing to assert a right to the Death Benefit.  ECF No. 62-5, at 15–18.  While this argument would be proper in support of a motion to dismiss Eisdorfer's cross-claims against the Trust Claimants, it is not relevant to the question of whether Gurrieri's cross-claim against Eisdorfer should be dismissed.  Underscoring this is the principle that a litigant's standing at the motion to dismiss stage is assessed based on the allegations made in their complaint or cross-claim.  *See Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 513 n.6 (2d Cir. 1994), *as modified on denial of reh'g by* Nos. 93-6230, 93-6232, 1994 U.S. App. LEXIS 20319 (2d Cir. June 13, 1994); *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1305–06 (S.D.N.Y. 1989) (assessing the allegations in a cross-claim to determine whether the party making that claim had standing).  But of course, it is hornbook law that in assessing Eisdorfer's motion to dismiss Gurrieri's cross-claim, I should look only within the four corners the cross-claim and the documents it incorporates.  *See McCarthy*, 482 F.3d at 191.  Plainly put, I cannot rule on the issue of Eisdorfer's standing when the allegations she would point to in order to establish that standing have not been properly made part of the record.

# **CONCLUSION**

Eisdorfer's motions to dismiss Gurrieri's cross-claim against Eisdorfer, Panzella's claim to the *Res*, and the *Pro Se* Defendants' cross-claims against Eisdorfer are DENIED.

**SO ORDERED.**

Brooklyn, New York
July 16, 2026

/s/ Edward R. Korman
Edward R. Korman
United States District Judge

27